IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SANDRA CARDER,                        )        CASE NO. 1:18-CV-578
                                      )
                    Plaintiff,        )
                                      )
        v.                            )
                                      )        MAGISTRATE JUDGE
                                      )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                )
SECURITY ADMINISTRATION,              )
                                      )        **MEMORANDUM OPINION & ORDER**
                    Defendant.        )

        Plaintiff Sandra Carder ("Carder") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of

the parties.  Doc. 12.

        For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

        Carder protectively filed applications for DIB and SSI on October 20, 2014, alleging a

disability onset date of December 1, 2011.  Tr. 15, 258.  She alleged disability based on the

following: bipolar depression, COPD, and asthma/emphysema.  Tr. 263.  After denials by the

state agency initially (Tr. 144, 145) and on reconsideration (Tr. 177, 178), Carder requested an

administrative hearing.  Tr. 189.  A hearing was held before an Administrative Law Judge

("ALJ") on March 22, 2017.  Tr. 62-98.  At the hearing, Carder amended her alleged onset date

to October 20, 2014.  Tr. 67, 257.  When she did, her DIB application became moot because her

date last insured expired prior to her alleged onset date, and she proceeded pursuant only to her

SSI application. Tr. 15, 67. In his June 22, 2017, decision (Tr. 15-32), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Carder can perform, *i.e.* she is not disabled. Tr. 31. Carder requested review of the ALJ's decision by the Appeals Council (Tr. 224) and, on January 18, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Carder was born in 1968 and was 46 years old on her amended alleged onset date. Tr. 258. She last worked in 2011 as a cleaner. Tr. 72. She has an eighth grade education and has been unable to obtain a GED. Tr. 71-72.

### B. Relevant Medical Evidence[1]

On September 19, 2014, Carder was admitted to Fairview Hospital due to shortness of breath and a cough. Tr. 682-683. She reported that she was a former cigarette smoker. Tr. 684. A nurse reported that she caught Carder smoking cigarettes in her bathroom and had to threaten her with a security search to get her to give up her cigarettes and lighter that she had denied having. Tr. 710. Carder acknowledged that she had smoked during her hospital stay—in her bathroom and leaving the hospital to smoke outside—despite repeated advice not to smoke. Tr. 711. She was diagnosed with dyspnea/COPD exacerbation, discharged on September 24, and advised to follow up with an ENT. Tr. 718.

On October 31, 2014, Carder went to the emergency room at Fairview Hospital complaining of shortness of breath and severe back pain from coughing for the last two weeks. Tr. 674. She reported no improvement with her medications. Tr. 674. Upon exam, she had

---

[1] Carder only challenges the ALJ's findings regarding her breathing impairments. Accordingly, only the medical evidence relating to these impairments is summarized and discussed herein.

tachycardia and decreased breath sounds but was not in respiratory distress and had no wheezes or rales. Tr. 675. She had not gotten her prescription for Pulmicort, which she was supposed to have been on. Tr. 677. She was diagnosed with shortness of breath and COPD exacerbation, admitted and treated; she left the hospital the next day against medical advice, with no orders or prescriptions, saying that she felt great. Tr. 677, 679-680.

On November 9, Carder returned to the emergency room at Fairview Hospital complaining of wheezing and was readmitted. Tr. 672. Her treatment notes indicate that she had a history of being non-compliant with medication. Tr. 672. She slowly improved with treatment, was observed to have been up and walking frequently, and was discharged on November 12, ambulating independently with a steady gait. Tr. 668, 672.

On November 30, Carder returned to the emergency room at Fairview Hospital and was admitted for a COPD exacerbation, having become short of breath while putting up holiday decorations outside. Tr. 633, 635. She ambulated in the hall with a steady gait. Tr. 639. She was instructed to notify the nurse if she was going to ambulate off the unit but was non-compliant with notification. Tr. 644. She was discharged on December 2. Tr. 648.

Carder was hospitalized at Fairview Hospital from December 13 through December 17, 2014, for a COPD exacerbation. Tr. 626. She was treated and improved upon discharge. Tr. 626. She was ambulating with a steady gait. Tr. 628.

On January 5, 2015, Carder went to Fairview Hospital complaining of shortness of breath and wheezing. Tr. 595. She was admitted for a COPD exacerbation. Tr. 597. She was discharged then readmitted on January 12 until January 16. Tr. 583, 594. She was diagnosed with acute COPD exacerbation with asthma and bronchitis and treated with antibiotics and IV steroids. Tr. 580-584. She frequently ambulated off her hospital floor, stating that she was

going for walks, and asked that her fluids be discontinued while she walked. Tr. 582.[2] The treatment note indicates that she had had six hospitalizations for COPD in the last three months. Tr. 590. She was released with an oxygen tank for use at home. Tr. 593.

On January 18, 2015, Carder was admitted and treated at Fairview Hospital for a collapsed lung after her boyfriend kicked her. Tr. 561. A chest tube was installed and she was discharged the next day. Tr. 572, 566. She returned on January 20 and was readmitted. Tr. 573. While admitted, the nurse found that she had disconnected her telemetry and was missing; the nurse walked around and could not find her and then finally found her, whereupon Carder stated that she had walked to the parking garage with a friend so that her friend could smoke. Tr. 573. She stated that she did not smoke but the nurse wrote that she smelled like cigarette smoke. Tr. 573. She left the hospital on January 21 against medical advice because her adult son unexpectedly came to town. Tr. 566, 529. She was readmitted on January 23 for chest and back pain and shortness of breath; she was restless, agitated and crying out in pain. Tr. 529. She admitted that she had not gotten her discharge prescriptions filled from her recent visit. Tr. 529. A chest CT scan showed emphysema in her lungs without other acute chest processes and a chest x-ray was normal. Tr. 533, 535. She denied use of street drugs but she had a positive toxicology screen for cocaine. Tr. 554. On January 25, she was walking in the hallway independently with a slow, steady gait. Tr. 550. She stated that she uses public transportation or a friend would give her a ride and she was independent with self-care and used no assistive devices. Tr. 551. She was discharged home on January 27 and declined to press charges against her boyfriend. Tr.

---

[2] Carder asserts that the hospital note states that she would likely need "acute rehab/skilled nursing," (Doc. 18, p. 7, citing Tr. 590), but the next paragraph of the treatment note advises that this statement was incorrectly added to Carder's note and that it refers to a different patient. See Tr. 590 ("the above addendum is incorrect. It is on the wrong patient. This patient (Sandra Carder) is not married and is here for a COPD exacerbation. She does not need acute rehab or skilled nursing. She will most likely be discharged to home tomorrow.").

558, 553.

On February 3, 2015, Carder had a follow up appointment with her pulmonologist and he sent her to the emergency room at Fairview Hospital for evaluation. Tr. 527-529. She was not taking her antibiotics because she was afraid of side effects. Tr. 528. The doctor instructed her to refill her prescriptions and to continue her supplemental oxygen "with exertion." Tr. 527-528.

On February 10, Carder returned to the emergency room at Fairview Hospital complaining of shortness of breath and a chronic cough. Tr. 515. She was treated with IV steroids and a nebulizer and was only slightly worse than baseline after this treatment. Tr. 517. Her treatment note reads that she "disconnected herself and walked to the bathroom and back without problems." Tr. 517. A nurse also wrote that Carder moaned in pain when she was checked on but that the moaning stopped when the nurse left. Tr. 520. She ambulated in the hallway without her oxygen. Tr. 520. She was diagnosed with a COPD exacerbation and instructed to use nebulizer treatments every four hours and albuterol as needed every two hours and to continue her other medications. Tr. 517. She was discharged the next day. Tr. 521.

On February 26, Carder went to Fairview Hospital complaining of shortness of breath, a cough and trouble breathing. Tr. 497-498. She admitted that she had smoked a cigarette that day. Tr. 498. She was given breathing treatments and steroids with some improvement and was admitted because she had failed outpatient therapy one week prior. Tr. 500. She was ambulating with a steady gate and did not use an assistive device. Tr. 501. She was discharged the next day. Tr. 509.

On March 6, Carder went to Fairview Hospital and was admitted for a COPD exacerbation. Tr. 463. She was without her medications for 2-3 days because her boyfriend threw them away. Tr. 463. She improved greatly with breathing treatments and oxygen. Tr.

465.  On March 9, she was walking in the hallway to get herself coffee.  Tr. 472.  She was also

being treated for gastrointestinal issues.  Tr. 480.  On March 10, a nurse found that she was not

in her room and that her room smelled like cigarette smoke.  Tr. 481.  Security was called and 15

minutes later she was back in her room, security having found her in the gift shop and having

spotted her in the parking garage.  Tr. 481.  On March 11, she was transferred to a new floor;

told not to leave the floor; stated that she would comply; and then, five minutes later, left the

room and then repeatedly left the floor.  Tr. 486, 490.  She ambulated independently.  Tr. 493.

She was discharged on March 12.  Tr. 490, 494.

On March 22, 2015, Carder returned to Fairview Hospital with shortness of breath and

chest pain and had not taken her medications for a few days because she fled her apartment after

having been assaulted by her boyfriend.  Tr. 438.  She was admitted and treated with nebulizer

treatments, antibiotics and steroids.  Tr. 449.  A chest x-ray showed hyperinflated lungs and

stable, small calcified scattered granulomas and no acute pulmonary process.  Tr. 436.  She was

discharged on March 25 and stated that she was staying with a friend.  Tr. 450.

On April 6, Carder returned to Fairview Hospital with shortness of breath and chest pain

and stated that her inhalers weren't working anymore.  Tr. 426.  She had recently been on a long

car trip to Kentucky to visit family for a week.  Tr. 426, 429.  She was given a breathing

treatment and felt better.  Tr. 429.  She requested a portable oxygen tank.  Tr. 432.  A CT lung

scan showed emphysematous changes and remote granulomatous disease.  Tr.420.  The next day

a nurse found her gone, her IV on the bedside table and her telemetry disconnected.  Tr. 433.

Security was called but Carder was not found.  Tr. 433.  She later called to say that she left due

to a family emergency.  Tr. 433.

Carder returned to Fairview Hospital on April 9 and was admitted.  Tr. 391.  She stated

that she was significantly worse than a few days before when she left the hospital against medical advice. Tr. 391. She was treated with IV steroids and nebulizer treatments. Tr. 423. A nurse saw her disconnect herself from her IV, leave her pump in the hall, go outside to smoke a cigarette, and then come back inside and re-insert her IV. Tr. 403. Her attending physician stated that he believed her recent exacerbation was due to noncompliance with treatment, drug use and social situations. Tr. 402. On April 11, she was walking in the hallways without oxygen. Tr. 403. She was discharged on April 14. Tr. 422-423.

On April 20, 2015, Carder told staff at MetroHealth Hospital that she lives with a friend in a room thirteen steps up with railings; she could manage the stairs and she was independent in her daily activities. Tr. 1718.

On June 14, 2015, Carder visited the emergency room at MetroHealth Hospital and was admitted for a COPD exacerbation. Tr. 1861. She was observed walking without oxygen. Tr. 1866. She was discharged on June 18. Tr. 1876.

On September 8, Carder went to the emergency room at Marymount Hospital for shortness of breath. Tr. 2930. She reported not having had her inhaler or nebulizers. Tr. 2930. She was treated for a COPD exacerbation, advised to stop smoking, and discharged on September 13. Tr. 2938.

On September 23, 2015, Carder went to St. Vincent Charity Medical Center for a cough and shortness of breath. Tr. 2614. A chest x-ray showed right lower lobe pneumonia. Tr. 2610.

On September 29, Carder went to the emergency room at Fairview Hospital for a cough, chest tightness, and mild shortness of breath upon exertion. Tr. 1930. Her symptoms started that morning and she had not used her inhaler since the evening before. Tr. 1930. She stated that she had been seen at another facility and was sent home with antibiotics, steroids and an inhaler, but

she did not fill any of the prescriptions they gave her. Tr. 1930. She was instructed to fill her prescriptions and was given a new nebulizer because she stated that hers had broken. Tr. 1933.

On October 6, 2015, Carder returned to the emergency room at Fairview Hospital for shortness of breath and a cough. Tr. 1935. Her inhalers were not working. Tr. 1935. She had had some improvement since her last hospital visit but she still felt that her "heart beating is tight." Tr. 1935. She reported a sudden increase in her symptoms after dusting. Tr. 1936. She smelled of tobacco but denied smoking; she stated that she lives with a smoker. Tr. 1936. An x-ray indicated possible pneumonia and she was given steroids and antibiotics. Tr. 1939.

On October 8, Carder returned to Fairview Hospital's emergency room complaining of trouble breathing. Tr. 1940. She was treated with "a few extra doses of IV steroids" and released the next day. Tr. 1940. From October 19 to 22 she was admitted at St. Vincent Charity Medical Center for a COPD exacerbation. Tr. 2621. Upon release she was active and doing activities with minimal shortness of breath. Tr. 2622.

On October 24, Carder went to the emergency room at Fairview Hospital complaining of shortness of breath. Tr. 1947. Her inhalers were not much help. Tr. 1947. She tested positive for cocaine. Tr. 1956. She was diagnosed with a COPD exacerbation, acute on chronic respiratory failure, and systematic inflammatory response syndrome. Tr. 1956. She was treated and discharged on October 27; at that time she could walk with her two liter oxygen tank. Tr. 1956.

On November 20, 2015, Carder went to the emergency room at Fairview Hospital for shortness of breath and a cough. Tr. 1971. Her home inhalers and nebulizer were not helping. Tr. 1971. She was treated with success, taken off oxygen, declined to be admitted, and was discharged. Tr. 1971. She requested medication refills and they were provided. Tr. 1975. She

returned the next day with continuing symptoms. Tr. 1977. She had not filled her prescriptions for prednisone and nebulizers. Tr. 2444. She was observed to smell like cigarette smoke. Tr. 1979. She was treated and discharged the next day. Tr. 2444.

On December 3, 2015, Carder went to the emergency room at Fairview Hospital complaining of shortness of breath. Tr. 2451. Upon exam, she was in respiratory distress and was shaky. Tr. 2452, 2468. She was admitted for a COPD exacerbation. Tr. 2452. Her toxicology screen was again positive for cocaine. Tr. 2458. She was treated and the next day was doing better but she still had mild shortness of breath and a cough. Tr. 2458. She denied smoking but the attending physician, whom had seen her frequently, stated that she was either non-compliant with her medications or she continued to use drugs/tobacco. Tr. 2463. She was discharged on December 8 with a "good turnaround"; she was able to walk the floors and was given a new medication. Tr. 2463, 2470.

On December 10 until December 14, Carder was admitted to MetroHealth Hospital for a COPD exacerbation. Tr. 2536. She again tested positive for cocaine. Tr. 2532. She was seen smoking outside the building during her stay and her lighter was confiscated. Tr. 2535-2536. The treatment notes indicate that she had been on three liters of home oxygen. Tr. 2531.

On December 29, Carder went to the emergency room at Fairview Hospital for a COPD exacerbation. Tr. 2474. She had been visiting ill family members for the holidays and had not taken her oxygen or nebulizers with her. Tr. 2474, 2479, 2484. She was admitted. Tr. 2478. She was diagnosed with a COPD exacerbation and acute bronchitis. Tr. 2487. She was treated with Albuterol, Atrovent, Solumedrol, Toradol, and Zofran. Tr. 2478. She removed her IV and "abruptly" left the hospital against medical advice on December 31, "without waiting for assessment and provision of treatment prescriptions." Tr. 2488.

9

Carder returned to Fairview Hospital on January 2, 2016, stating that she felt much worse. Tr. 2489. She was admitted and advised to stop leaving the hospital against medical advice. Tr. 2492. She admitted using drugs and tested positive for cocaine. Tr. 2498. She was discharged on January 5. Tr. 2509.

Carder returned to the emergency room at MetroHealth on February 2, 2016, complaining of shortness of breath. Tr. 2964. She admitted smoking cigarettes and using crack cocaine two days prior. Tr. 2964. She was admitted for a COPD exacerbation likely secondary to crack cocaine use. Tr. 3007. She was also assessed and treated by psychiatry and she admitted being non-compliant with her mental health treatment and medications. Tr. 2973. She was discharged on February 5. Tr. 3043.

On March 8, Carder went to the emergency room at Fairview Hospital and was admitted the next day for a COPD exacerbation. Tr. 2844. She had run out of her inhalers. Tr. 2848. She was discharged on March 14. Tr. 2861. She was readmitted at Fairview Hospital on March 17; she first stated that she was compliant with her medication but then admitted that she did not have a nebulizer at home. Tr. 2869. She was treated and discharged the next day, diagnosed with a COPD exacerbation and influenza. Tr. 2872, 2874.

On March 21, Carder returned to Fairview Hospital and was admitted. Tr. 2878. She was diagnosed with a COPD exacerbation and hospital-acquired pneumonia. Tr. 2888. The attending physician wrote that Carder was well-known to him and that, although she was supposed to follow up with him as an outpatient, she "barely" did so and instead had been frequently admitted for COPD exacerbations. Tr. 2883. She was treated and discharged on March 25. Tr. 2888.

On May 16, 2016, Carder went to Fairview Hospital for shortness of breath and a cough.

Tr. 2917. She had missed her appointment with a pulmonologist on May 5. Tr. 2921. She returned to Fairview Hospital on May 20 for domestic violence, chest pain and shortness of breath and was admitted. Tr. 2922. She was found smoking in the bathroom. Tr. 2922. She was discharged May 21. Tr. 2922. There is a treatment note from May 27 indicating that Carder left against medical advice and never arrived to her room. Tr. 2925.

On June 17, Carder went to the emergency room at MetroHealth Hospital. Tr. 3133. The treatment note states that she had been admitted at Fairview Hospital from June 13 to June 15. Tr. 3133. She stated that she did not feel better and was not sure whether she was taking antibiotics. Tr. 3133. A toxicology screen was positive for cocaine, which the attending physician said likely exacerbated her COPD. Tr. 3156. She was admitted, treated and discharged on June 20 and given a pulmonary referral. Tr. 3155.

On July 20, Carder went to MetroHealth Hospital for a COPD exacerbation due to heat and construction in her neighborhood and was admitted. Tr. 3159. She was also treated for a perforated colonic abscess, which required her to stay in the hospital until July 31. Tr. 3233-3234, 3320-3321.

On October 3, Carder went to the emergency room at Fairview Hospital for shortness of breath and a cough for the past three weeks. Tr. 3703. She had developed chest and back pain from her cough. Tr. 3703. She had been using her home breathing treatments and home oxygen without relief. Tr. 3703. She had not followed up with her primary care physician or her pulmonologist during her current three-week episode. Tr. 3703. She was treated and admitted. Tr. 3708. On October 4, she had a physical therapy evaluation with Jennifer Brown, P.T. Tr. 3709. She had an abnormal gait (shuffling, short choppy strides, decreased cadence and step length, wide base). Tr. 3711. Brown recommended Carder use a wheeled walker for ambulation

while in the hospital but that "no equipment needs anticipated" upon discharge. Tr. 3709. She was discharged on October 7. Tr. 3729.

On October 25, 2016, Carder went to the emergency room at Fairview Hospital due to shortness of breath and a cough. Tr. 3651. She ambulated with her oxygen with a stable gait. Tr. 3650. She was treated with Solumedrol, albuterol, and Atrovent; had significant improvement; and was discharged home as stable. Tr. 3654. While there, she met with a licensed social worker who observed that Carder had had 10 hospitalizations and 3 emergency room visits in 2016 and spoke to her about her non-compliance with home treatment. Tr. 3655. Carder stated that she was compliant with home oxygen and medications but had not followed up with her primary care physician. Tr. 3655.

On January 1, 2017, Carder went to the emergency room at Fairview Hospital complaining of shortness of breath. Tr. 3672. A chest x-ray showed her lungs were expanded and clear, without infiltrates or effusions, and no active disease. Tr. 3688. She was "much improved" after breathing treatments and steroids and discharged. Tr. 3680. She went to MetroHealth Hospital on January 5 for shortness of breath, stating that her building was sprayed and she had trouble breathing. Tr. 3763. She was discharged on January 9. Tr. 3784. She returned to MetroHealth on January 14 and admitted for a COPD exacerbation secondary to a coronavirus. Tr. 3734, 3751. She was discharged on January 20. Tr. 3758.

On March 24, 2017, Carder went to the emergency room at MetroHealth for a cough, shortness of breath, wheezing, and rib pain. Tr. 4544. She was treated and improved. Tr. 4552. She was saturating well on home oxygen and her chest x-ray remained stable. Tr. 4558.

### C. Medical Opinion Evidence

On August 20, 2015, state agency reviewing physician Rebecca Neiger, M.D., reviewed Carder's record and opined that she could perform light work but could never climb ladders, ropes, or scaffolds, could frequently climb ramps and stairs and crawl, and must avoid concentrated exposure to temperature extremes, humidity, and pulmonary irritants. Tr. 113-115. In support of her opinion, Dr. Neiger explained that Carder was repeatedly non-compliant with treatment and her oxygen saturation levels were repeatedly above 90% even upon admission; she also cited these as reasons why Carder did not meet or equal a listed impairment. Tr. 115. On December 4, 2015, state agency reviewing physician Esberdado Villanueva, M.D., reviewed the record and agreed with Dr. Neiger's assessment. Tr. 153-155.

**D. Testimonial Evidence**

**1. Carder's Testimony**

Carder was represented by counsel and testified at the administrative hearing. Tr. 64-90. She lives with her boyfriend and has four adult children. Tr. 71. She last worked for a temp agency doing cleaning work and quit in 2011 because she did not get along with the woman who worked there. Tr. 73. She quit a prior fast-food job because she had moved and two prior restaurant jobs she had ended because they went out of business. Tr. 73-74. She had to stop working as a cashier at Walmart because she had to have hand surgery and could no longer lift things and she had to stop working as a "dietary" at a hospital because she had to take care of her niece. Tr. 75.

When asked why she felt that she is disabled, Carder stated that she knows she messed up with the drugs and the smoking but she was going through a lot of things. Tr. 76. As for her "breathing thing," she thought that when she got on her medications she didn't have to go back to her doctors because she was breathing, but that was wrong. Tr. 76. She knows that she

should have kept going to her doctors and to see her pulmonary doctor.  Tr. 76.  Her breathing problem was made worse by her not doing that.  Tr. 76.

Carder testified that she quit smoking cigarettes about one month prior to the hearing.  Tr. 76.  She used a nicotine patch to quit; previously, she did not use a patch when trying to quit and she just tried to quit smoking by "just quitting."  Tr. 77.  The person she lives with smokes and she goes in the other room when he does it because she can't handle the smell of it anymore.  Tr. 77.  She has used oxygen for about three years, all the time, 24 hours a day.  Tr. 77.  She started using a walker two years prior.  Tr. 77.  She uses a walker because she gets out of breath too fast and the walker has a seat on it which allows her to sit down.  Tr. 77.  The walker was prescribed by the home health aide that was coming to see her.  Tr. 77-78.  Prior to using a walker, she did not use any assistive device.  Tr. 78.

Carder stated that the last time she used crack was about a month ago.  Tr. 78.  Her breathing is worse when she smokes crack/cocaine.  Tr. 88.  The person she lives with smokes crack and she has to get away from him.  Tr. 78.  If she got disability she could move.  Tr. 78.  Her daughter helps her do things such as get her ID and go to appointments.  Tr. 78-79.  She is able to go to appointments on her own but it's hard; she gets there by bus or by transportation provided by the hospital.  Tr. 79-80.

Carder has inhalers and a nebulizer for her COPD, which she uses regularly.  Tr. 80.  She has an oxygen machine at her place and a smaller one that she had with her at the hearing.  Tr. 81.  She also takes medication for mental health issues and the medication helps her.  Tr. 81.  Since she has stopped smoking, she feels like her chest is tighter and she gets out of breath a lot quicker.  Tr. 81.  With her oxygen and walker, she could walk a couple of houses down the street before having to stop.  Tr. 84.  She can stand in place fine; as long as she is not moving, she can

14

breathe.  Tr. 85.  She can't sit for more than an hour or hour and a half because she has pain in her hip.  Tr. 85.  She thinks she could maybe lift and carry five or ten pounds.  Tr. 85.

Carder stated that she tries to clean but she can't because she gets out of breath.  Tr. 86.  The day before she tried to vacuum but she was only able to vacuum a little square spot before she got out of breath.  Tr. 86.  She can't cook because she gets out of breath standing there or moving back and forth.  Tr. 86.  She puts items on her walker to move them but she gets out of breath doing that.  Tr. 86.  She doesn't do laundry because she can't carry the basket and go up and down the steps.  Tr. 86.  She goes outside to sit, although she can't do this when it's cold.  Tr. 87.  Because of her living situation, it is hard for her to stop using cocaine and smoking.  Tr. 87-88.

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 90-97.  The ALJ discussed with the VE Carder's past work.  Tr. 91.  When asked whether a hypothetical individual with Carder's work experience could perform her past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, the VE answered that such an individual could not perform Carder's past work but could perform other jobs in the national economy such as table worker, final assembler, and bonder.  Tr. 92-95.

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.     If claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his June 22, 2017, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since October 20, 2014, the application date.  Tr. 17.

2. The claimant has the following severe impairments: chronic obstructive pulmonary disease (COPD), history of drug addiction, major depressive disorder, and panic disorder.  Tr. 18.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 18.

4. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant must be able to pull a wheeled oxygen tank. The claimant is limited to frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds.  The claimant is limited to crawl frequently.  The claimant must avoid concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation.  The claimant can perform simple routine tasks in a setting where changes are explained and implemented slowly.  The claimant can perform goal-oriented work but could not work at a production rate pace.  The claimant can occasionally interact with supervisors and coworkers, but would work best in small groups and cannot have contact with the public.  Tr. 20.

5. The claimant is unable to perform any past relevant work.  Tr. 30.

6. The claimant was born in 1968 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 30.

7. The claimant has a limited education and is able to communicate in English.  Tr. 30.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 30-31.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 31.

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 20, 2014, the date the application was filed.  Tr. 32.

## V. Plaintiff's Arguments

Carder challenges the ALJ's decision on two grounds: the finding that Carder did not meet Listing 3.02 and the finding that her use of a wheeled walker was not medically necessary. Doc. 18, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ did not err at Step Three

Carder argues that the ALJ erred when he found that Carder did not meet the criteria in Listing 3.02D.  Doc. 18, p. 12.  At Step Three, an ALJ considers whether the claimant has an impairment that meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. §404.1520(a)(4)(iii).  A claimant must meet all of the specified medical criteria to show that her impairment matches an impairment in the listings; an impairment that manifests only some of

those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530

(1990).

To meet Listing 3.02D, Chronic Respiratory Disorders due to any cause, a claimant must

have:

> Exacerbations or complications requiring three hospitalizations within a 12–month period
> and at least 30 days apart (the 12–month period must occur within the period we are
> considering in connection with your application or continuing disability review). Each
> hospitalization must last at least 48 hours, including hours in a hospital emergency
> department immediately before the hospitalization.

20 CFR Part 404, Subpart P, Appendix 1.

The ALJ, considering listing 3.02, wrote,

> The claimant's COPD does not meet or equal listing 3.02 for Chronic Respiratory
> Disorders due to any cause because the record does not contain documentation of
> chronically low FEV levels, FVC levels, two unadjusted single-breath DLCO levels
> below the levels found in the listed criteria, low pulse oximetry levels that meet the listed
> criteria, or exacerbations or complications requiring three hospitalizations within a twelve
> month period and at least thirty days apart with the hospital stays lasting at least forty-
> eight hours including time spent in the emergency room immediately before
> hospitalization.

Tr. 18.

Carder argues that the ALJ erred because she meets the requirements of listing 3.02D,

*i.e.*, she had three hospitalizations lasting at least 48 hours within a 12-month period at least 30

days apart. Doc. 18, p. 16. She lists these visits as follows:

> October 31-November 1, 2014
> November 9-12, 2014
> January 12-15, 2015
> January 17-21, 2015
> January 23-26, 2015
> March 7-12, 2015
> March 23-25, 2015
> April 9-14, 2015
> April 6-8, 2015
> October 19-22, 2015
> December 3-8, 2015

January 2-5, 2016
June 17-19, 2016

Doc. 18, p. 16.  Carder does not indicate when the 12-month period starts for her calculation. And her list of hospitalizations is incomplete; for instance, she does not include her November 30 to December 2 and December 13-17, 2014 hospitalizations; thus, there is no 30-day gap between her hospitalizations from November 2014 to January 2015, as she suggests.

Nevertheless, it appears that Carder did have three hospitalizations lasting a least 48 hours within a 12-month period at least 30 days apart.  Her January 2015 stay and her March 6, 2015, hospitalizations are the first two.  And, although Carder does not list her admissions to MetroHealth Hospital in June 2015 and September 2015, these visits also lasted more than 48 hours and occurred more than 30 days apart from other admissions and within one year of her January 2015 visit.  Defendant does not disagree that Carder had three hospitalizations lasting at least 48 hours within a 12-month period at least 30 days apart.  Doc. 19, p. 10.

However, the ALJ thoroughly discussed Carder's emergency room visits and hospital stays and accurately explained that her visits were the result of her non-compliance with treatment and that she stabilized with hospital-administered treatment.  *See* 20 CFR Part 404, Subpart P, Appendix 1, Section 3.00D.1 ("What documentation do we need to evaluate your respiratory disorder? .... descriptions of any prescribed treatment and your response to it."). Although the ALJ did not say so in his Step Three explanation, the ALJ thoroughly detailed the record evidence showing that Carder was not compliant with treatment, responded to treatment when administered, and her non-compliance caused her COPD exacerbations.

The ALJ recited the following: Carder's hospital treating physicians commented that her COPD exacerbations were caused by her non-compliance with treatment, her smoking and drug use, and social situations.  Tr. 22, 24.  Carder continued to smoke against medical advice,

including while at the hospital; she routinely did not take her COPD medications as prescribed; she routinely failed to follow up with her treatment between hospital visits; she repeatedly disconnected herself from her IV and telemetry while receiving treatments at hospitals; and she repeatedly left hospitals against medical advice (only to return soon thereafter feeling worse). Tr. 22-25. While in the hospital, she was seen walking the hallways without her oxygen unit and she travelled out of town without her oxygen unit, despite claiming to have been at home on oxygen all the time. Tr. 24. She stabilized at the hospitals with Solumedrol therapy and breathing treatments. Tr. 22-25, 27.

By the end of 2016, Carder had had ten hospitalizations and three emergency room visits due to non-compliance. Tr. 25. She denied smoking and cocaine use but was seen smoking, admitted smoking, and routinely had positive cocaine toxicology results. Tr. 25, 26. She claimed limited mobility but was regularly found walking the hallways and going off her floor at the hospitals, going outside or into the parking garage at the hospitals, and she reported to nursing staff that she lived in a room that required her to walk up thirteen steps, which she could manage, and that she was independent in her activities of daily living. Tr. 27. Her most recent findings included a chest x-ray in January 2017 that showed no active disease and a pulmonary assessment in March 2017 that showed she was saturating well on home oxygen. Tr. 28. Furthermore, Carder herself admitted during her testimony that her non-compliance with treatment—her smoking and not following up with her doctors—made her condition worse. Tr. 76. Her attorney acknowledged that the state agency reviewers found her non-compliance with treatment meant that she did not meet or equal listing 3.02. Tr. 68.

In sum, although the ALJ did not expressly state at Step Three that he discredited Carder's hospitalizations because they were due to non-compliance with treatment, he did so in

the balance of his thoroughly detailed opinion, wherein he explained all the ways in which Carder was not compliant with treatment and that Carder's treating doctors had opined that her non-compliance was causing her COPD exacerbations and hospitalizations. Carder's related argument—that the ALJ did not thoroughly examine whether Carder met the 3.02 criteria (Doc. 18, p. 17)—fails for the same reason. The ALJ did not err at Step Three when he found that Carder did not meet listing 3.02.

### B. The ALJ did not err when he found Carder's walker was not medically necessary

Carder argues that the ALJ erred when he found that her wheeled walker was not medically necessary. Doc. 18, p. 18. She asserts that the ALJ improperly substituted his own judgment for that of a doctor. Doc. 18, pp. 18-19.

"[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work." *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013), citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002); *Cruz-Ridol Carreon v. Comm'r of Soc. Sec.*, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018), *report and recommendation adopted*, 2018 WL 1083252. To be considered a restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary," *i.e.*, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane." *Murphy*, 2013 WL 829316, at *10 (internal citations omitted). "If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE." *Id*. Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment, and did not provide an

explanation for the omission. *Cruz-Ridolfi*, 2018 WL 1136119, at * 10 (quoting *Watkins v. Comm'r of Soc. Sec.*, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017), *report and recommendation adopted*, 2017 WL 6389607).

Here, the ALJ stated that Carder's walker had been prescribed by an attending physician during one of Carder's hospital visits for her shortness of breath upon ambulation[4] (Tr. 25) and he explained why he did not include the use of a walker in his RFC assessment,

> Furthermore, the claimant alleged at the hearing that she must use a wheeled walker to ambulate and the record shows she received a walker in October of 2016 to help with shortness of breath upon ambulation (Hearing Testimony; 20F/64-67). However, the necessity of the walker is certainly questionable when the claimant previously demonstrated very little difficulty ambulating around the hospital after disconnecting herself from the medical equipment to walk away from the admission floor, and go all the way outside or into the parking garage to smoke without the assistance of a wheeled walker (5F/11, 47, 100, 187, 239-245, 294, 325; 17F/5, 24, 55; 18F/2-25, 62). Considering the fact that the claimant received the walker to help reduce her shortness of breath upon exertion, the records show as recently as January 1, 2017, a chest x-ray further showed the claimant's lungs as expanded and clear, without infiltrates, no effusions, and no active disease (20F/43, 49). Moreover, a pulmonary assessment in March of 2017 noted that the claimant is currently saturating well on home oxygen and her chest x-ray remained stable (23F/12-15). Accordingly, the undersigned considered this evidence and limited the claimant to the sedentary exertional level given her history of breathing difficulties upon exertion. Likewise, the undersigned acknowledges the use of supplemental home oxygen and thereby included in the functional capacity that the claimant [] must be able to pull a wheeled oxygen tank and must avoid concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation. Given the inconsistencies described above with regard to the claimant's allegations of limited mobility, the undersigned limited the claimant to frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds, and crawl frequently.

Tr. 27-28. In short, the ALJ stated that Carder had been prescribed an assistive device, he did not include the use of the device in his RFC assessment, and he provided an explanation for the omission, citing substantial evidence in support. This was not error. *Cruz-Ridolfi*, 2018 WL 1136119, at * 15-16 (the ALJ acknowledged the claimant had been prescribed a cane, considered

---

[4] The cited record indicates only that a physical therapist provided Carder with a wheeled walker for use while she was in the hospital and it does not indicate that Carder was prescribed or provided one upon discharge. Tr. 3709.

evidence of the claimant's use of a cane, and properly found that use of a cane was not warranted due to inconsistencies in the record).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED.

Dated: March 7, 2019

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge